UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| LEANDRO R. P., | : |
| Petitioner, | : Civ. No. 20-3853 (KM) |
| v. | : |
| THOMAS DECKER, *et al.*, | : **OPINION** |
| Respondents. | : |

**KEVIN MCNULTY, U.S.D.J.**

## I.  INTRODUCTION

Petitioner, Leandro R. P.,[1] is an immigration detainee currently held at the Hudson County Correctional Center, in Kearny, New Jersey. He is proceeding by way of counsel with a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241. (DE 1.) Presently before the Court is Petitioner's Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order. (DE 4). Pursuant to Local Civil Rule 78.1, this matter is decided without oral argument. For the reasons set forth below, the Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order (DE 4) will be granted insofar as a Temporary Restraining Order shall be issued. This decision should not be taken as signifying a result in any other individual case; rather, it is a reflection of the unique circumstances present in this particular case.

---

[1] Consistent with guidance regarding privacy concerns in social security and immigration cases by the Committee on Court Administration and Case Management of the Judicial Conference of the United States, Petitioner is identified herein only by his first name and last initial.

## II.     BACKGROUND

**A. COVID-19**

The United States is currently experiencing a global pandemic due to a rapidly spreading infectious disease known as COVID-19. As of the date of this opinion, there are over 632,000 reported cases of COVID-19 in the United States and more than 31,000 people have died as a result. *See* Ctrs. for Disease Control and Prevention, *Cases in U.S.*, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited Apr. 17, 2020). Currently, New York and New Jersey are two of the states most impacted by the virus, with more than 211,500 and 71,000 cases respectively. *See id.* As of April 1, 2020, Respondents report that at Hudson County Correctional Center ("HCCC"), where Petitioner is detained, at least two immigration detainees have tested positive for COVID-19, 14 inmates have tested positive, and 12 staff members have tested positive. (DE 17 at 13; DE 17-5 at 10.) Petitioner indicates that only days later, those numbers have apparently increased with 41 staff members having tested positive for COVID-19, 22 inmates and immigration detainees having tested positive, and multiple staff members having died from complications due to COVID-19. (DE 19 at 8.)

According to the Centers for Disease Control and Prevention ("CDC"), COVID-19 is a respiratory illness that can spread "[b]etween people who are in close contact with one another (within about 6 feet)" and from contact with contaminated surfaces. *See* Ctrs. for Disease Control and Prevention, *How COVID-19 Spreads*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited Apr. 17, 2020). The CDC states that "[t]he virus that causes COVID-19 is spreading very easily and sustainably between people." *See id.* Even those who do not show symptoms of the virus may be able to spread it. *See id.* Common symptoms of COVID-19 include a fever, cough, and shortness of breath. *See* Ctrs. for Disease Control and

Prevention, *Symptoms of Coronavirus*, https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited Apr. 17, 2020). Certain groups of individuals are at "higher risk for severe illness from COVID-19." *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 17, 2020). These "high risk" individuals include, but are not limited to, those who are over 65 years of age, have asthma, or are immunocompromised. *See id.* In order to prevent the spread of the virus, the CDC recommends "social distancing" (staying at least six feet away from others), wearing cloth face coverings when in public, regular disinfection of "frequently touched surfaces," and washing hands often with soap and water, among other practices. *See* Ctrs. for Disease Control and Prevention, *Prevent Getting Sick*, https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/disinfecting-your-home.html (last visited Apr. 17, 2020). Ultimately, however, "[t]he best way to prevent illness is to avoid being exposed to this virus." *See id.*

According to the CDC, correctional and detention facilities present "unique challenges for control of COVID-19 transmission," due to the fact that individuals "live, work, eat, study, and recreate within congregate environments[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 17, 2020). This close proximity heightens the potential that COVID-19 will spread. *See id.* Moreover, the "ability of incarcerated/detained persons to exercise disease prevention measures (e.g., frequent handwashing) may be limited and is determined by the supplies provided in the facility and by security considerations." *See id.* The stark reality is that "avoiding exposure to COVID-19 is impossible for most detainees and inmates." *Cristian A.R. v. Thomas Decker, et al.,* Civ. No.

3

20-3600, ECF No. 26 at *3 (D.N.J. Apr. 12, 2020). It is against this backdrop that Petitioner filed the instant action.

### B. Factual and Procedural Background of Petitioner's Case

####     i.    *Procedural History and Criminal Background*

Petitioner is a 32-year-old native and citizen of the Dominican Republic. (DE 17-2 at 4.) He arrived in the United States on or about August 7, 1993 at the age of five as a Lawful Permanent Resident ("LPR"). (*Id.*) He has resided in New York continuously since that time and he has three United States citizen children. (DE 1 at 15-16.)

It appears that between July 28, 2005 and July 9, 2019, Petitioner has been arrested 15 times. (DE 17-1.) Almost all of these arrests resulted in convictions which include, but are not limited to: fifth degree criminal possession of stolen property; second degree criminal contempt; second degree criminal trespass; second degree attempted strangulation; and multiple counts of petit larceny. (*Id.*)

As a result of his convictions, Petitioner was arrested by Immigration and Customs Enforcement ("ICE") and served with a Notice to Appear ("NTA") on January 22, 2020. (DE 17-2.) The NTA initiated removal proceedings against him and charged him with removability under section 237(a)(2)(A)(ii) of the Immigration and Nationality Act for having been "convicted of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct." (*Id.*) Petitioner is subject to mandatory detention under 8 U.S.C. § 1226(c) and has remained in detention since he was arrested on January 22, 2020. (DE 17-3; DE 1 at 16.) Petitioner denies removability. (DE 1 at 16.)

On March 20, 2020, Petitioner filed, through counsel, a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 in the Southern District of New York. (DE 1.) He separately filed a

Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order ("TRO"). (DE 4.) On April 3, 2020, Respondents filed opposition to Petitioner's motion. (DE 17.) Petitioner thereafter filed a reply. (DE 19.) On April 9, 2020, the case was transferred to the District of New Jersey and assigned to this Court. (DE 23.) In his petition and motion, Petitioner argues that Respondents are violating his due process rights under the Fifth Amendment to be free from punitive conditions of confinement and to receive adequate medical care by continuing to detain him during the current pandemic. (DE 1 at 25-26; DE 4 at 7-11.)

      *ii.*    *Pre-Existing Medical Condition*

Pertinent to this case are Petitioner's underlying medical conditions. Petitioner states that he suffers from hypertension, asthma, and a long history of smoking. (DE 19 at 7.) Petitioner also alleges that he is suffering from symptoms consistent with traumatic brain injury, as a result of blunt force trauma and a seizure he suffered in February 2020. (*Id.* at 16-17.) Petitioner provides his medical records from HCCC and his former place of detainment, Bergen County Jail, as evidence of these conditions. (DE 19-1.)

**C. HCCC's COVID-19 Protocols**

Also relevant to this case are the protocols ICE and HCCC have implemented in an effort to combat the spread of COVID-19. (DE 17 at 9-13.) Respondents state that ICE has "Field Medical Coordinators" who are overseeing clinical services at local facilities, such as HCCC. (*Id.* at 10.) ICE also has epidemiologists who have "been tracking the outbreak, regularly updating infection prevention and control protocols and issuing guidance to field staff on screening and management of potential exposure among detainees." (*Id.* at 11.) Respondents state that testing of ICE detainees for COVID-19 is consistent with guidance issued by the CDC. (*Id.*) If a detainee exhibits symptoms compatible with COVID-19, they are placed in isolation for testing. (*Id.*) If that

detainee tests positive, they remain isolated and are given medical treatment. (*Id.*) Detainees who experience "clinical deterioration" are referred to a local hospital. (*Id.*) Additionally, detainees who have had exposure to individuals with confirmed COVID-19 are placed in "cohorts" for 14-days and monitored daily. (*Id.*)[2] Respondents state that, per ICE policy, detainees with a communicable disease, such as COVID-19, are placed "in an appropriate setting in accordance with CDC, state, or local health department guidelines." (*Id.*)

Respondents indicate that to address COVID-19 concerns, HCCC has kept additional medical staff on-site, begun screening staff members and visitors, carefully limited recreation to allow for social distancing, segregated inmates and detainees who have tested positive or show symptoms of COVID-19, increased cleaning and disinfection of the facility, and provided additional sanitation measures to detainees. (*Id.*)

### III. LEGAL STANDARDS

#### A. Temporary Restraining Order

To obtain a temporary restraining order or a preliminary injunction, a petitioner must provide a "threshold" showing of two critical factors: (1) a likelihood of success on the merits of his claim; and (2) that he is "more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). A likelihood of success on the merits requires "a showing significantly better than negligible but not necessarily more likely than not." *See id.* Additionally, "[h]ow strong a claim on the merits is enough depends on the balance of the harms: the more net harm an injunction can prevent, the weaker the plaintiff's

---

[2] The CDC defines cohorting as "the practice of isolating multiple laboratory-confirmed COVID-19 cases together as a group, or quarantining close contacts of a particular case together as a group." *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 17, 2020).

claim on the merits can be while still supporting some preliminary relief." *Id.* at 178 (quoting *Hoosier Energy Rural Elec. Coop., Inc. v. John Hancock Life Ins. Co.*, 582 F.3d 721, 725 (7th Cir. 2009)). If these two "gateway factors" are met, then the Court considers the remaining two factors which aim to balance the equities of the parties: "the possibility of harm to other interested persons from the grant or denial of the injunction," and "the public interest." *Id.* at 176 (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919-20 (3d Cir. 1974)). The Court considers, "in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* at 179.

### B. "Extraordinary Circumstances" Test for Bail

In the Third Circuit's decision in *Lucas v. Hadden*, 790 F.2d 365 (3d Cir. 1986), the Court held that a petitioner may be eligible for bail prior to ruling on the merits of his petition under "extraordinary circumstances." *See id.* at 367. The Court held that this standard reflected "the recognition that a preliminary grant of bail is an exceptional form of relief in a habeas corpus proceeding." *See id.* The Court cited as an example of extraordinary circumstances its prior decision in *Johnston v. Marsh*, 227 F.2d 528 (3d Cir. 1955), where a petitioner who was "gravely ill" and required hospitalization was granted bail pending his habeas petition. *See id.* The Third Circuit in *Lucas* expressly clarified that a petitioner's poor health was not the only "extraordinary circumstance" that would justify a grant of bail. The Third Circuit reaffirmed this "extraordinary circumstance" test in its later opinions in *Landano v. Rafferty*, 970 F.2d 1230, 1239 (3d Cir. 1992) and *In re Souels*, 688 F. App'x 134, 135-36 (3d Cir. 2017). Most recently, this same "extraordinary circumstances" standard has been utilized by other courts within this district in addressing whether to grant bail to immigration habeas petitioners seeking relief during the COVID-19 pandemic. *See*

*Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at *16; *Rafael L.O.*, Civ. No. 20-3481, 2020 WL 1808843, at *5 (D.N.J. Apr. 9, 2020).

## IV. DISCUSSION

Petitioner avers that his continued detention during the currently global pandemic, given his serious medical conditions, violates his due process rights under the Fifth Amendment. (DE 4 at 7.) Specifically, Petitioner raises two arguments: (1) that his conditions of confinement are tantamount to punishment, and (2) that Respondents have failed to provide him with adequate medical protections. (*Id.*) Under the circumstances presented here, I find that he has met the standard for a TRO, as well as the extraordinary circumstances justifying bail.

### A. Temporary Restraining Order

#### i. *Likelihood of Success on the Merits*

##### a. Conditions of Confinement Claim

Petitioner argues that although the Due Process Clause protects detainees from being subjected to conditions of confinement that amount to punishment, the current conditions at HCCC are unduly punitive. (DE 1 at 25.) Petitioner contends that he is unable to practice social distancing, use hand sanitizer, or wash his hands regularly, making it all but impossible to protect himself against COVID-19. (*Id.*) He states that Respondents failure to provide him with the ability to protect himself during the outbreak of a contagious disease constitutes unconstitutional punishment. (*Id.*) Respondent argues, however, that "there is no basis for Petitioner to equate his detention at the HCCC, which is pursuant to an express statutory mandate, to unlawful punitive detention." (DE 17 at 16.) While I take note that Petitioner's detention is mandatory under 8 U.S.C. § 1226(c), and that such detention may not itself violate due process, Petitioner's claim challenges the *conditions* of his confinement rather than the authority to detain him. Thus, the fact that

8

Petitioner is subject to mandatory detention does not negate his argument that the conditions of his confinement may be unconstitutional. *See E.D. v. Sharkey*, 928 F.3d 299, 306-07 (3d Cir. 2019) (holding that immigration detainees are entitled to the same due process protections as pretrial detainees and delineating the applicable legal standard for a detainee's conditions of confinement claim).

Respondents do not argue that this Court lacks jurisdiction to hear Petitioner's conditions of confinement claim. (*See generally* DE 17.) Nevertheless, I note that the Supreme Court has "left open the question whether [detainees] might be able to challenge their confinement conditions via a petition for a writ of habeas corpus." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1862-63 (2017); *see also Bell v. Wolfish*, 441 U.S. 520, 526 n.6 (1979) ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement."); *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1973) ("When a prisoner is put under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal."). Federal courts, however, have seemingly condoned challenges to conditions of confinement raised through a habeas petition. *See Aamer v. Obama*, 742 F.3d 1023, 1032 (D.C. Cir. 2014); *Woodall v. Fed. Bureau of Prisons*, 432 F.3d 235, 242-44 (3d Cir. 2005); *Ali v. Gibson*, 572 F.2d 971, 975 n.8 (3d Cir. 1978). Furthermore, under 28 U.S.C. § 2241, a district court may exercise jurisdiction over a habeas petition when the petitioner is in custody and alleges that this custody violates the constitution, laws, or treaties of the United States. 28 U.S.C. § 2241(c); *Maleng v. Cook*, 490 U.S. 488, 490 (1989). Accordingly, I find the caselaw indicates that an immigration detainee may raise a conditions of confinement claim in his § 2241.

Unlike convicted prisoners whose conditions of confinement claims arise under the Eighth Amendment, pretrial and immigration detainees are entitled to heightened protections. *See Bell v. Wolfish*, 441 U.S. at 535-36; *see also Sharkey*, 928 F.3d at 306-07. Accordingly, an immigration detainee's conditions of confinement claim is properly analyzed under the Due Process Clause of the Fifth (or Fourteenth) Amendment. *See Sharkey*, 928 F.3d at 307. Under that clause, "a detainee may not be punished prior to an adjudication of guilt." *See id.* In order to determine whether a challenged condition amounts to punishment, a court looks at whether that condition "is reasonably related to a legitimate government objective." *Sharkey*, 928 F.3d at 307. If it is not, then a court may infer "that the purpose of the governmental action is punishment that may not be constitutionally inflected upon detainees *qua* detainees." *Id.* (quoting *Hubbard v. Taylor*, 538 F.3d 229, 232 (3d Cir. 2008)).

Whether a condition of confinement is reasonably related to a legitimate government objective turns on whether the condition serves a legitimate purpose and is rationally related to that purpose. *See Hubbard*, 538 F.3d at 232. A petitioner can demonstrate that a challenged condition amounts to punishment if there is "an expressed intent to punish on the part of detention facility officials," if there is no "alternative purpose to which [the condition of confinement] may rationally be connected is assignable for it," *or* if the condition is "excessive in relation to the alternative purpose assigned [to it]." *See Bell*, 441 U.S. at 538 (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69 (1963)).[3]

---

[3] In support of his claim, Petitioner relies on the Supreme Court's decision in *Helling v. McKinney*, 509 U.S. 25 (1993). In *Helling*, the Court found that a prisoner successfully asserted a conditions of confinement claim based upon exposure to environmental tobacco smoke, despite the fact that he was asymptomatic, because the Eighth Amendment protected against "sufficiently imminent dangers[.]" *See id.* at 34-35. The Court determined that the Eighth Amendment requires individuals be provided with basic human needs, which includes "reasonable safety," and that it would be "cruel and unusual punishment to hold convicted criminals in unsafe conditions." *See id.*

This inquiry has recently been addressed within the context of the current COVID-19 pandemic. In *Thakker v. Doll*, Civ. No. 20-480, 2020 WL 1671563 (M.D. Pa. Mar. 31, 2020), the Court found that although the government had a legitimate objective in "preventing detained aliens from absconding and ensuring that they appear for removal proceedings," the "unsanitary conditions" and "high risk of COVID-19 transmission" were not rationally related to that objective. *See id.* at *8. The Court explained that "[s]ocial distancing and proper hygiene are the *only* effective means by which we can stop the spread of COVID-19" and that the petitioners had shown that, "despite their best efforts, they cannot practice these effective preventative measures in the Facilities." *See id.* The Court found Respondent's legitimate governmental objective was

---

at 33 (internal quotation marks and citation omitted). *Helling* recognized that inmates are entitled to relief where they prove risk of exposure to serious contagious illnesses.

> We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year. In *Hutto v. Finney,* 437 U.S. 678, 682, 98 S.Ct. 2565, 2569, 57 L.Ed.2d 522 (1978), we noted that inmates in punitive isolation were crowded into cells and that some of them had infectious maladies such as hepatitis and venereal disease. This was one of the prison conditions for which the Eighth Amendment required a remedy, even though it was not alleged that the likely harm would occur immediately and even though the possible infection might not affect all of those exposed. We would think that a prison inmate also could successfully complain about demonstrably unsafe drinking water without waiting for an attack of dysentery. Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms.

*Id.* at 33.

While *Helling* supports Petitioner's proposition that exposure to an infectious disease may constitute an unconstitutional condition of confinement, it is important to note that this case does not provide the appropriate legal standard. *See Cristian A.R.,* Civ. No. 20-3600, ECF No. 26 at *20. The appropriate legal standard is whether a challenged condition amounts to punishment. *See Sharkey*, 928 F.3d at 307.

weakened in particular by the other options ICE had to monitor detainees that did not require their confinement. *See id.*

Similarly, in *Rafael L.O.*, the Court concluded that Respondents had a legitimate governmental objective in preventing detainees from absconding, but that the conditions of the prison, the current global pandemic, and the medical vulnerabilities the petitioners suffered from, resulted in conditions of confinement that were tantamount to punishment. *See Rafael L.O.*, 2020 WL 1808843, at *7-8. The Court found that, "Respondents [did not] have an express intent to punish Petitioners," but that "such intent is not a necessary prerequisite." *See id.* at *7.

Most recently, in *Cristian A.R.*, which dealt with detainees who were also confined at HCCC, the Court held that the totality of the circumstances compelled a finding that the conditions of confinement amounted to punishment. *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at *21. Although the Court found that the protocols Respondents implemented to prevent the spread of COVID-19 were "laudable," the Court ultimately determined that these enhanced measures were insufficient. *See id.* at *22. In describing the inadequacies of the facilities enhanced measures, the Court stated, in pertinent part:

> Petitioners spend 23.5 hours a day in cramped cells that they have to share with another person and the remaining thirty minutes out of their cells in common areas. It is during those thirty minutes that the detainees are at high risk for COVID-19 exposure and transmission. That brief period is the only time they have each day to take showers, make telephone calls to family members and attorneys, visit the commissary, and use recreation areas. Coming into close contact with frequently used items and shared spaces is unavoidable. Respondents do not state the Facilities clean and sanitize the common areas and frequently-touched common items in-between each period during which new detainees and inmates leave their cells. Instead, they provide that cleaning occurs at least three or four times per day. *See* Ahrendt Decl. ¶ 9.K; Edwards Decl. ¶¶ 11, 12.E. Accordingly, even crediting the Facilities' increased efforts to clean and disinfect shared spaces, Respondents cannot dispute that many, if not all, detainees use the common areas and objects in-between

> cleanings and are being exposed to potentially contaminated surfaces. Detainees also report that corrections officers' and medical staff's use of gloves and masks is inconsistent and certainly not in line with the CDC's recommendations, further compounding their risk of exposure. *See* Arcia-Quijano Decl. ¶ 5; Gordillo Decl. ¶ 11; Durkin Decl. ¶ 9.
>
> To make matters worse, detainees who want to do their part in curtailing the spread of COVID-19 to themselves and others are not provided the resources to do so. Detainees are forced to share soap or have no soap at all, *see, e.g.*, Eisenzweig Decl. ¶ 8, and lack other basic hygiene items like hand sanitizer. Respondents do not indicate whether and how often soap or other hygiene products are provided to detainees. That means, when they return to their cells to begin their next 23.5-hour period of confinement, detainees are unable to perform the most effective measure of combatting the spread of the virus: washing and disinfecting their hands. Showering is not an option because their only access to showers is during their brief half-hour recreational period. Covering their faces with masks or hands with gloves is also not possible, unless they have already shown signs of COVID-19, but by that time, avoiding infection is likely too late. *See* Ahrendt Decl. ¶ 9.G.; Edwards ¶ 14.

*Id.* at *22-24.

Guided by the decisions in *Thakker*, *Rafael L.O.*, and *Cristian A.R.*, I find that the circumstances presented in the instant case appear tantamount to punishment. Although Respondents have delineated the numerous measures they have undertaken to prevent the spread of COVID-19 in HCCC, those measures appear insufficient to protect Petitioner whose hypertension, asthma, and history of smoking place him at higher risk of severe illness from COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 17, 2020). Petitioner alleges an inability to adhere CDC guidance on how to protect himself from contracting COVID-19. (DE 4 at 9.) Although he does not provide the same grim set of circumstances as those set forth by the petitioners in *Cristian A.R.*, he does

state generally that he is unable to practice social distancing, use hand sanitizer, or wash his hands regularly. (*Id.*)

I do not find that Respondents have an express intent to punish Petitioner, however, I am not required to make such a finding in order to conclude that the conditions of confinement amount to punishment. *See Bell*, 441 U.S. at 538; *see also Rafael L.O.*, 2020 WL 1808843, at *7. I also recognize that Respondents have a legitimate purpose in ensuring Petitioner does not abscond and in protecting the public, especially given Petitioner's criminal history. Yet, given the current pandemic and Petitioner's serious underlying health conditions which place him at higher risk for severe illness if he contracts COVID-19, I find that the conditions of his confinement are excessive in relation to the Respondent's purpose. This especially true given the existence of the available alternatives to Petitioner's confinement. *See Thakker*, 2020 WL 1671563, at *8. Accordingly, I find that Petitioner has shown a likelihood of success on the merits on his conditions of confinement claim.

### b. Deliberate Indifference Claim

Petitioner's second due process claim alleges that Respondents have demonstrated deliberate indifference towards his serious medical needs by "failing to adequately protect" him and by "not [taking the] necessary or appropriate precautions." (DE 4 at 9.) Respondents argue they have not evinced deliberate indifference, as demonstrated by the numerous protocols they have implemented to stop the spread of COVID-19. (DE 17 at 17.) Respondents again do not address whether Petitioner's claim is properly raised in a § 2241. However, even assuming Petitioner could raise such a claim in a § 2241, he has not shown a likelihood of success on the merits on this claim.

The applicable legal standard for an immigration detainee's inadequate medical care claim is that of deliberate indifference. *See Harvey v. Chertoff*, 263 F. App'x 188, 191 (3d Cir. 2008) (citing *Natale v. Camden Cty. Corr. Facility*, 318 F.3d 575, 581-85 (3d Cir. 2003)); *see also Camacho Lopez v. Lowe*, Civ. No. 3:20-CV-563, 2020 WL 1689874, at *7 (M.D. Pa. Apr. 7, 2020). Thus, to succeed on a claim of inadequate medical care, a petitioner must show: (1) "a serious medical need," and (2) "acts or omissions by prison officials that indicate deliberate indifference to that need." *Natale*, 318 F.3d at 582. "To act with deliberate indifference to serious medical needs, is to recklessly disregard a substantial risk of serious harm." *Harvey*, 263 F. App'x at 191 (citing *Estelle v. Gamble*, 429 U.S. 97, 105-05 (1976) and *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). The Third Circuit has found deliberate indifference in situations where: "(1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017).

Here, although the possibility of contracting COVID-19 presents a grave risk, Respondents have undertaken numerous measures in order to combat the spread COVID-19 and prevent detainees from contracting the illness. Respondents have implemented protocols that are consistent with the guidance set forth by the CDC for Correctional and Detention Facilities, and HCCC is being supervised by an ICE Field Medical Coordinator, as well as ICE epidemiologists who are monitoring the outbreak and continuously updating infection prevention and control protocols for facilities. These actions do not demonstrate that prison officials have recklessly disregarded the substantial risk of harm that COVID-19 poses. Rather, these actions indicate that Respondents are

actively taking significant steps to try and prevent detainees from contracting COVID-19. While there may not yet be a perfect solution to preventing the spread of this infectious disease, Respondents conduct simply does not demonstrate a deliberate indifference to the current global pandemic. Accordingly, Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim.

While Petitioner has not shown a likelihood of success on the merits of his deliberate indifference claim, he has demonstrated a likelihood of success on his conditions of confinement claim. Therefore, I find that Petitioner has met the first factor required for the grant of a TRO.

*ii.     Irreparable Harm*

The second threshold showing Petitioner must make in order to be granted a TRO is that he is "more likely than not" to suffer irreparable harm absent the relief requested. *See Reilly*, 858 F.3d at 179. Respondents argue that Petitioner's desired relief will not ameliorate or diminish any heightened risk of injury resulting from COVID-19, nor will his release prevent him from contracting COVID-19. (DE 17 at 19.)

Indeed, there is currently no guarantee against contracting COVID-19. However, as stated previously, correctional and detention facilities present "unique challenges for control of COVID-19 transmission[.]" *See* Ctrs. for Disease Control and Prevention, *Guidance for Correctional & Detention Facilities*, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html (last visited Apr. 14, 2020). Within facilities such as HCCC, detainees "cannot practically adhere to social distancing guidelines or the adequate level of personal hygiene," measures which have been "touted as the most effective means to thwart the spread of the virus." *See Cristian A.R.,* Civ. No. 20-3600, ECF No. 26 at *25-26 (quoting *Rafael L.O.*, 2020 WL 1808843, at *8). The number of cases in HCCC underscore this point. (DE 32 at

16

20-21.) Moreover, given Petitioner's hypertension, asthma, and history of smoking, he is especially at risk of developing severe illness if he contracts COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 17, 2020). Thus, it is apparent that Petitioner is more likely than not to suffer irreparable harm if his confinement at HCCC continues.

   *iii.    Balancing of the Equities*

I next consider the remaining two factors: the possibility of harm to other interested persons from the grant or denial of the injunction and the public interest. For the reasons explained above, there remains a significant possibility of harm to Petitioner if he remains detained at HCCC. He has multiple serious medical conditions which each place him at greater risk of developing severe illness as a result of COVD-19. It is also in the public interest to release Petitioner before he contracts COVID-19 in order to "preserve critical medical resources and prevent further stress on the states' and country's already overburdened healthcare systems." *See Cristian A.R.*, Civ. No. 20-3600, ECF No. 26 at *27.

I recognize that Respondents have a legitimate interest in ensuring Petitioner does not abscond and in protecting the public, especially given Petitioner's relatively lengthy criminal history. However, Petitioner has significant ties to the United States. He has been a Lawful Permanent Resident of the United States since he was five years old. He has resided in New York for almost 30 years and has three sons who are United States citizens. (DE 1 at 16.)

Given all of these considerations, I believe that Respondents' interests and Petitioner's interests can be appropriately addressed by releasing Petitioner to home confinement and subject to electronic monitoring. The specific conditions of his release are set forth in the Order

accompanying this Opinion. In balancing each of these factors, I find that they favor the grant of a TRO to the following extent.

### B. Extraordinary Circumstances Warranting Bail

The United States is the midst of a global pandemic and Petitioner is currently detained in a facility which is "at the epicenter of the outbreak" in the United States. *See Cristian A.R.,* Civ. No. 20-3600, ECF No. 26 at *28. Petitioner suffers from hypertension, asthma, and a history of smoking—serious conditions which have been identified by the CDC as worsening the risk of severe illness from COVID-19. *See* Ctrs. for Disease Control and Prevention, *Groups at Higher Risk for Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/groups-at-higher-risk.html (last visited Apr. 17, 2020). The risk to Petitioner's health is grave. Accordingly, I find that these facts constitute extraordinary circumstances which warrant release on bail.

### V. CONCLUSION

For the foregoing reasons, Petitioner's Motion for an Order to Show Cause, Preliminary Injunction, and Temporary Restraining Order (DE 30) will be granted insofar as a Temporary Restraining Order shall be issued. An appropriate Order accompanies this Opinion.

DATED: April 17, 2020

/s/ Kevin McNulty
_____
KEVIN MCNULTY
United States District Judge